IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEMETRIUS BAILEY | : | CIVIL ACTION |
| | : | NO. 07-719 |
| v. | : | |
| | : | |
| DAVID DIGUGLIELMO, et al. | : | |

O'NEILL, J.                                    FEBRUARY 8, 2011

<u>MEMORANDUM</u>

Plaintiff Demetrius Bailey is a state prisoner who is presently incarcerated at SCI-Fayette.

On December 4, 2007, he filed a four count amended complaint against twenty-two defendants,

alleging violations of various constitutional rights.[1]  Pretrial motions resulted in the dismissal of

one count and fourteen defendants.[2]  I held a three-day bench trial[3] on the remaining three counts

---

[1]        Plaintiff's amended complaint alleged the following claims: (1) Count I -
Deliberate Indifference to Plaintiff's Conditions of Confinement; (2) Count II - Excessive Force;
(3) Count III - Deprivation of Personal Property; and (4) Count IV - Retaliation.  <u>See</u> Am. Comp.
(March 5, 2008) (Doc. No. 23).
        The amended complaint named the following twenty-two individuals as defendants: (1)
David DiGuglielmo; (2) Sylvia Pallott; (3) William Banta; (4) Mary Canino; (5) Wendy Moyer;
(6) Julie Knauer; (7) Myron Stanishefski; (8) Heather Craiter; (9) Stephen Campbell; (10) John
Lozar; (11) Charles Andrew; (12) Andrew Thomas; (13) Earl Thomas; (14) Kenneth Marshall;
(15) Thomas Achey; (16) Jeffrey McCusker; (17) Jennifer Gonzalez; (18) Steven Gavlik; (19)
Kevin Macgreggor; (20) Jeffrey Trower; (21) Felipe Arias; and (22) Charles Stott.

[2]        On May 27, 2008, I dismissed Arias from the case.  Then, in late 2008, Stott died.
By order dated January 28, 2007, I entered judgment in favor of defendants on count III and part
of count IV.  <u>See</u> Order (Jan. 28, 2010) (Doc. No. 43).  I also dismissed DiGuglielmo, Pallott,
Canino, Moyer, Knauer, Campbell and Stanishefski from the case.  <u>Id.</u>  Plaintiff also conceded
that defendant Andrews was entitled to be dismissed, <u>see</u> Pl.'s Br. at 2 (Jan 20, 2010) (Doc. No.
41), but it appears that I inadvertently declined to dismiss him in my January 29, 2010 Order.  In
any event, plaintiff did not pursue any claim against Andrews and thus he is entitled to judgment
in his favor.
        On August 2, 2010, the first day of trial, plaintiff voluntarily dismissed Marshall, Earl
Thomas, Gonzalez and Banta.  <u>See</u> Trial Tr. 3:21-25 (Aug. 2, 2010) (Doc. No. 76).

[3]        The case was originally scheduled to be tried to a jury.  Voir dire resulted in a jury
panel of fewer than eight members.  Because there were no other panelists available, each party

against defendants Thomas Achey, Heather Craiter, Steven Gavlik, John Lozar, Kevin MacGreggor, Jeffery McCusker, Andrew Thomas and Jeffery Trower.

BACKGROUND

Plaintiff is a thirty-seven year old native of Keysport, Pennsylvania. He was incarcerated at SCI-Graterford during the events giving rise to this lawsuit. He claims that on three separate occasions defendants violated his Eighth Amendment rights. Defendants wholly deny plaintiff's allegations. I will recount the relevant testimony of each witness and then set forth my findings of fact.

I.      November 28, 2006

    A.      Plaintiff's Testimony

On November 28, 2006, plaintiff was an inmate at SCI-Graterford. Trial Tr. 18:2-3 (Pl. Test.) (Aug. 2, 2010). That morning, he was escorted from his cell in C block, id. at 64:18-19, to the internal security department and placed on a wooden bench in the hallway. Id. Aaron Washington, an inmate from C block, id. at 64:20-24, who was in the internal security department to provide a urine sample, sat down next to him on the bench. Id. at 22:1-2. The two inmates had a "general conversation" about why plaintiff was in the internal security department and "then . . . went on to talk about some other stuff that was on TV Friday night." Id. 22:2-5. During the conversation, plaintiff had his legs stretched across the hallway, leaving approximately twelve inches between his feet and the opposite wall. Id. 20:20-21:2; Trial Tr. 15:10-16:14 (Pl. Test.) (Aug. 3, 2010) (plaintiff demonstrating how he was seated). He claimed

_____

waived on the record his or her right to a jury trial. See Trial Tr. 13:13-23 (Aug. 2, 2010) (plaintiff's waiver of his right to a jury trial); id. at 14:12-15:9 (defendants' waiver of their rights to a jury trial).

that during the conversation, Achey approached the two men sitting on the bench and, as he passed them, stated to plaintiff "[i]f you don't move your legs, I'm going to break them." Trial Tr. 22:7-8 (Pl. Test) (Aug. 2, 2010). Plaintiff later characterized Achey's statement slightly differently: "[h]e said, I'm going to fucking break [your legs]." Id. at 23:15-16. Although plaintiff claimed that he regarded Achey's statement as a threat to his life, id. at 23:16-17, he did not respond. Id. at 23:4-5.

Plaintiff, believing that Achey had sufficient room to pass, did not move his legs. Id. at 22:9-10; 23:11-12.. He testified that when Achey returned and saw plaintiff's legs in the same position, he stepped on plaintiff's left kneecap "trying to break [plaintiff's] leg forcefully and violently." Id. at 22:10-12. Plaintiff then stood up "because [his] knee was in pain." Id. at 22:13-14. At that point, McCusker punched plaintiff multiple times in his face and jaw, which caused plaintiff to fall downward toward the bench. Id. at 22:14-15. According to plaintiff, as he was falling McCusker attempted to grab the front of his shirt but Achey grabbed his shirt from behind and both officers "participated in slamming [him] to the floor." Id. at 22:16-20. While plaintiff was on the ground, Achey punched him in the back of his head and McCusker, though attempting to punch him in the face, succeeded only in hitting his shoulders and body. Id. at 22:21-25. The assault lasted for five minutes, during which Gonzalez, Thomas and Marshall watched without intervening. Trial Tr. 25:12-24 (Pl. Test) (Aug. 3, 2010). Afterwards, plaintiff was then lifted to his feet, slammed against the wall and taken to the medical department. Trial Tr. 22:24-25 (Pl. Test) (Aug. 2, 2010). Plaintiff testified that he limped all the way to the medical department. Trial Tr. 27:8-11 (Pl. Test) (Aug. 3, 2010).

B.    Washington's Testimony

Washington was an inmate at SCI-Graterford on November 28, 2006. Trial Tr. 55:17-19 (Washington Test.) (Aug. 3, 2010). He knew plaintiff from "seeing him around [the prison]." Id. at 55:14. On the morning of November 28, 2006, Washington was in the security department to provide a urine sample. Id. at 57:1-15. He testified that after providing a sample he was told to sit on the same bench upon which plaintiff was seated. Id. at 58:19-59:2. As they were sitting there, Achey came out of his office and "asked [plaintiff] to move his leg." Id. at 60:8-9. After plaintiff refused to move his legs, Achey stepped over them and stated "[i]f you don't have your legs moved when I come back, I'm going to break them." Id. at 61:6-8. Achey then walked toward the front of the security department. Id. at 61:16-20.

As Achey was returning to his office, he again stated to plaintiff "move your legs." Id. at 61:22-62:2. Plaintiff again refused to move his leg. Id. at 62:6. Achey then "stomped on [plaintiff's] leg a couple times." Id. at 62:8-9. McCusker ran to the scene and repeatedly punched plaintiff in his face and on his head. Id. at 63:1-5. Although Achey did not punch plaintiff, he stomped on plaintiff's leg "a few times" and pulled him off the bench as McCusker continued to punch him. Id. at 63:9-13. The officers then threw plaintiff to the ground, id. at 63:22-64:2, and several other officers "picked him up off the ground and escorted him out." Id. at 63:18-19. Washington never heard plaintiff threaten the officers and never saw him try to punch or kick the officers. Id. at 17-24.

C.    Achey's Testimony

On November 28, 2006, Achey was employed as a corrections officer at SCI-Graterford. Trial Tr. 73:17-19 (Achey Test.) (Aug. 4, 2010). He was assigned to take urine samples from inmates. Id. at 73:22-25.

On the morning of November 28, 2006, Achey had been informed that plaintiff needed to provide an investigative urine sample. Id. at 74:10-11. Achey stepped out of his office and "ordered [plaintiff] to produce an investigative urine within two hours." Id. at 74:18-20. Plaintiff, in response, stated "[f]uck you. I ain't giving you no fucking urine." Id. at 74:22-23. Achey did not respond. Id. at 74:25-75:1. He instead returned to his office to print out the "urine results" that he had received that morning. Id. at 74:24-75:2. The printer was located near the front of the security department. Id. at 75:4-8. In order to get the printed results, Achey needed to walk past the bench upon which plaintiff was seated. Id. at 76:1-3. He testified that plaintiff was "lounging on the bench [with] his feet . . . extended in the hallway towards the opposite wall . . . ." Id. at 76:8-10. Despite plaintiff's position, Achey testified that he was able to walk past, id. at 13, and did so without incident. Id. at 76:13-18. After retrieving the urine results from the printer, Achey proceeded back toward his office. Id. at 76:20. This time, plaintiff kicked him in the leg as he passed the bench. Id. at 22-24. Plaintiff then stood up, which prompted McCusker to order him to sit back down on the bench. Id. at 77:4-6. Plaintiff initially complied but then stood up again. Id. at 77:6-7. McCusker and Achey "grabbed [plaintiff] to put him back on the bench." Id. at 77:7-8. As they attempted to return him to the bench, "he kind of slid off the end of the bench and landed on the floor." Id. at 77:8-10. While the officers were attempting to regain control over plaintiff, he kicked Achey several more times. Id. at 77:11-14. Achey and McCusker then escorted plaintiff back to his cell. Id. at 77:22-24. They reported to the sergeant in charge of plaintiff's cell block that "he [had] not see[n] medical." Id. at 78:4-5.

D.     McCusker's Testimony

McCusker was employed as a corrections officer at SCI-Graterford on November 28,

2006. Trial Tr. 55:9-17 (McCusker Test.) (Aug. 4, 2010). He was assigned to the internal security department at the prison. Id. at 55:11-12.

On the morning of November 28, 2006, McCusker was ordered to obtain a urine sample from Washington. Id. at 56:18-24; 57:7-8. He obtained the sample and then escorted Washington to the waiting area outside of the security department. Id. at 57:15-17. The waiting room is separated from the hallway in which plaintiff was sitting by a mirrored door. Id. at 57:4-5. An individual standing in the waiting area would be unable to see into the hallway. Id. McCusker testified that he placed Washington in the waiting room because "the [inmate] count hadn't cleared yet, so there's no movement [allowed] in the institution. He would have had to wait [in the security department waiting room] until the internal count cleared [before returning] to his housing unit." Id. at 57:20-23.

After placing Washington in the waiting room, McCusker returned to the security department where he found plaintiff sitting on the bench in the hallway. Id. at 57:24-58:1. McCusker heard Achey tell plaintiff that he "[had] two hours to produce a urine sample." Id. at 57:25-60:1. Plaintiff responded to the request by stating "[f]uck you, I'm not going to give you any urine." Id. at 60:15-16. Achey went into his office and then, seconds later, returned to the hallway, walked past plaintiff and walked into the printer room at the end of the hallway. Id. at 60:19-25. As Achey passed by plaintiff on the way back to his office, McCusker observed plaintiff lunge at and kick Achey. Id. at 61:2-4. As plaintiff lunged, "he was coming up off the bench." Id. at 62:14. McCusker "grabbed [plaintiff] by his lapels [and] ordered him to sit back onto the bench, which he did under his own power." Id. at 62:15-16. McCusker then asked plaintiff "are you done?" Id. at 62:17. Plaintiff responded in the affirmative so McCusker let

6

him go.  Id. at 62:18.  Upon being released, plaintiff immediately "came back up again off the

bench towards [Achey] . . . ."  Id. at 62:19-20.  This time Achey and McCusker each grabbed one

of plaintiff's arms and "put him back to the bench."  Id. at 62:21-22.  As McCusker ordered

plaintiff to sit, "he hit the end of the bench and fell to the floor."  Id. at 62:23-24.  McCusker did

not see plaintiff hit his head or face when he fell to the floor.  Id. at 68:11-12.  Upon notifying the

shift commander of what had happened, McCusker and Achey were ordered to escort plaintiff to

his cell.  Id. at 63:9-10.  When they got there, the officers notified the unit sergeant "that

[plaintiff] had not been seen by medical at that point."  Id. at 64:2-3.

E.      Earl Thomas's Testimony

Earl Thomas[4] was employed as a corrections officer at SCI-Graterford on November 28,

2006.  Trial Tr. 30:7-8 (E. Thomas Test.) (Aug. 4, 2010).  He was assigned to the internal

security department as a member of the search team.  Id. at 30:1.

On the morning of November 28, 2006, Earl Thomas escorted plaintiff and his cellmate,

Carl Whitehead, from their cell to the internal security department, where he placed plaintiff on a

wooden bench in the hallway, id. at 35:13-16, and Whitehead on a bench around the corner.  Id.

35:22-36:2.  He then entered an office to complete his paperwork.  Id. at 36:24-37:1.  From the

hallway, Earl Thomas heard a loud voice state "[w]ell, why did you kick me? Why did you kick

me?"  Id. at 37:7-8.  He then heard "scuffling" outside the door of his office which prompted him

to step into the hallway.  Id. at 9-11.  Upon entering the hallway, he saw plaintiff sitting on the

floor.  Id. at 37:15-19.  McCusker and Achey were each holding one of plaintiff's arms and they

---

[4]      I use Earl Thomas's first name to distinguish him from Andrew Thomas, a
defendant in this case.

were helping him to his feet.  Id. at 37:18-19.  When Earl Thomas saw that the officers had the situation under control, he immediately proceeded around the corner to where Whitehead was seated to prevent him from getting involved.  Id. at 37:20-25.  Earl Thomas testified that Whitehead was the only inmate other than plaintiff who was in the hallway at the time of the incident.  Id. 38:1-3.

F.    Marshall's Testimony

Marshall was employed as a corrections officer at SCI-Graterford on November 28, 2006. Trial Tr. 40:23-24 (Marshall Test.) (Aug. 4, 2010).  He was assigned to the internal security department that day, where he worked from 6:00 A.M. to 2:00 P.M.  Id. at 40:25-41:4.  His partner was Earl Thomas.  Id. at 42:1.

On the morning on November 28, 2006, Marshall and Earl Thomas escorted plaintiff and Whitehead to internal security.  Id. at 46:4-8.  Plaintiff was seated on a bench in the hallway and his cellmate was seated on a bench around the corner from him.  Id. at 46:4-47:2.  The benches were approximately six feet apart and there was no line of sight between the two men.  Id. at 47:5-13.  After placing the inmates on their respective benches, Marshall entered his office to do his paperwork.  Id. at 47:23-48:4.  While he was in the office, he heard a "little ruckus" in the hallway.  Id. at 48:13.  When he entered the hallway, he found Achey and McCusker picking plaintiff up and placing him back on the bench.  Id. at 48:13-16.

G.    Drumheller's Testimony

Theresa Drumheller is a registered nurse who has been employed by SCI-Graterford for more than ten years.  Trial Tr. 70:15-20 (Drumheller Test.) (Aug. 3, 2010).  At 7:10 A.M. on November 28, 2006, she examined plaintiff who reported that he had been "assaulted by two

corrections officers." Id. at 75:6-7. Drumheller observed that plaintiff walked into the dispensary without any difficulty and had no visible bruising or swelling on his leg. See Pl.'s Ex. 48. She checked his vital signs which revealed that his heart rate and blood pressure were in the normal range. See id.; Trial Tr. 80:24-81:4 (Drumheller Test.) (Aug. 3, 2010). She observed "minimal swelling" on the left side of plaintiff's jaw, just below his ear. See Pl.'s Ex. 48; Trial Tr. 76:22-77:3 (Drumheller Test.) (Aug. 3, 2010). She also noted, however, that plaintiff was able to move his jaw freely and that he didn't have a broken jaw or any loose teeth. Trial Tr. 76:25-77:3 (Drumheller Test.) (Aug. 3, 2010). Plaintiff did not complain of any pain in his chest, shoulders, back or abdomen. Id. at 77:8. She told plaintiff that if he experienced any further symptoms he should submit a "sick call slip" to see the doctor the next day. Id. at 80:6-8.

H. Freeman's Testimony

Gia Freeman is a physician's assistant, who was employed from October 2005 until October 2007 at SCI-Graterford. Trial Tr. 85:8-17 (Freeman Test.) (Aug. 3, 2010). She worked from 8:00 A.M. to 4:00 P.M. on November 28, 2006. Id. at 86:3-5. At 8:25 A.M., she examined plaintiff, id. at 87:18-20, who claimed that he had been assaulted by corrections officers. Id. at 89:16-17. Freeman diagnosed plaintiff as suffering from "[m]uscular and skeletal pain that was due to trauma." Id. at 90:3. Trauma, according to Freeman, includes "any injury that may have occurred that wasn't natural. It could have been from an accident, fall, [or] assault [including a punch.]" Id. at 90:5-10. She prescribed 600 milligrams of ibuprofen to be taken twice a day for as long as plaintiff was in pain. Id. at 93:7-9.

II. December 15, 2006

A. Plaintiff's Testimony

In late 2006, plaintiff was housed on the E wing of J block. Trial Tr. 29:18-19 (Pl. Test.) (Aug. 2, 2010). J block is a prison building that is shaped like a cross. Pl.'s Ex. 44. Each arm of the cross contains two wings. Id. There are eight wings in total and each has been assigned a letter from A through H. Id. In the center of the cross is a room that inmates and prison officials refer to as "the bubble" because occupants can see into all eight wings. Trial Tr. 31:1-3 (Pl. Test) (Aug. 3, 2010) Plaintiff shared his cell with a cellmate. Id. at 28:21-23. He testified that "I told them, before they put me in [the cell], that I'm not going to be able to cope with no cellmate, so but they forced me in there . . . ." Id. at 32:13-15. He disputed, however, testimony by several witnesses that he threw his cellmate's property out of the cell. Id. at 32:16-17.

On December 14, 2006, he received "threats" from Andrew Thomas and "the guards."[5] Trial Tr. 51:16-19 (Pl. Test.) (Aug. 2, 2010). Plaintiff filed a grievance, complaining about such threats. Id. at 51:13-22.

The next day, he visited the medical department, which is outside of J block, to have his blood pressure checked. Id. at 33:10-11. Upon returning from his medical examination between 6:00 P.M. and 8:00 P.M., he entered J block through the entrance between A wing and H wing. Id. at 33:10-11; id. at 49:14-15 (noting that the assault happened between 6:00 P.M. and 8:00 P.M.). His hands and his feet were in shackles and a chain bound his leg irons to his handcuffs. Id. at 36:18-20. Immediately upon entering the building, he observed Andrew Thomas and MacGreggor with their shirts off. Id. at 33:10-14. The two officers placed plaintiff into a small cell, which the prison uses as a barbershop, located just to the left of the main entrance to J block.

_____

[5]        In his trial testimony, plaintiff did not describe the nature of the threats he received.

Id. at 33:15-22. Plaintiff waited in the barbershop for approximately five to ten minutes until Andrew Thomas, MacGreggor and Gavlik returned. Id. at 33:21-24. The three officers escorted plaintiff clockwise around the bubble. Id. at 33:23-25. Plaintiff, assuming that he was being returned to his cell, attempted to enter E wing when the trio reached the E wing gate. Id. at 33:23-34:1. At that point, Andrew Thomas grabbed plaintiff and then Gavlik and MacGreggor "reacted" and "[plaintiff] was slammed to the floor." Id. at 34:1-3. They dragged plaintiff approximately ten feet from the E wing entrance to the adjacent D wing entrance. Id. at 34:4-6. When they arrived at the D wing entrance, plaintiff was "knocked up against the door." Id. at 34:5-6. Then, while he was on the floor, Gavlik and MacGreggor hit and kicked him and Andrew Thomas punched him in the face. Id. at 34:6-8. At this point a fourth officer, who plaintiff was unable to identify, joined the group. Id. at 38:18-19. The four officers then lifted plaintiff into the air and carried him to cell D-12, which was located near the end of D wing. Id. at 34:11-12. While the officers were carrying plaintiff, MacGreggor took out a stun gun and repeatedly stunned plaintiff. Id. at 34:11-17. MacGreggor also struck plaintiff repeatedly with the stun gun. Trial Tr. 39:2-8 (Pl. Test.) (Aug. 3, 2010).

When the group arrived at D-12 the cell door was already open. Trial Tr. 34:22 (Pl. Test.) (Aug. 2, 2010). Plaintiff was "slammed inside D-12," id. at 35:1, and while he was lying on the floor Andrew Thomas stated "[i]f [plaintiff] move[s], hit him with the stun gun again." Id. at 35:9-10. Despite the fact that plaintiff did not move, MacGreggor stunned him again. Id. at 35:9-11. Plaintiff estimated that, while he was in D-12, MacGreggor stunned him three to five times in total. Id. at 40:5. While plaintiff remained on the floor, the unidentified officer placed his knee on plaintiff's neck and the officers began to rip plaintiff's clothes from his body. Id. at

11

35:13-14.  Plaintiff did not know what instrument the officers used to remove his clothes.  Id. at 35:14-15.  Once the door to the cell was closed, the officers pulled plaintiff to the cell door by means of a tether they had placed on the belt to his handcuffs.  Id. at 35:16-19.  The officers removed the shackles and handcuffs, turned the lights off and left plaintiff alone in the cell.  Id. at 35:18-19.  Plaintiff estimated that from the time at which he entered D wing, the assault lasted for more than ten minutes.  Id. at 41:4-5.  Lieutenant Lozar witnessed the assault from his vantage point in the bubble.  Id. at 47:1-7.

According to plaintiff, the cell was in deplorable condition.  There was trash, feces, urine and sour milk on the floor and the walls.  Id. at 34:24-35:1.  The toilet and sink were both inoperable.  Id. at 35:4-6.  There were no mattresses, no sheets, no pillows and no towels.  Id. at 35:24-25.  The bed was made of concrete, which plaintiff described as "like lying on the sidewalk."  Id. at 35:25-36:2.  He did not have access to a pen and paper.  Id. at 42:23-24.

Plaintiff was held in D-12 for five days.  Id. at 43:7-8.  During that time, he was naked, id. at 42:24-25, and did not receive any food or water.  Id. at 43:19-21.  He also did not receive medical treatment for his injuries or his daily dosage of blood pressure medication.  Id. at 44:21-45:3.

After the assault, plaintiff asked Andrew Thomas to tell the medical department that he needed assistance.  Id. at 48:6-7.  Andrew Thomas simply laughed and said "I told you I was going to get you."  Id. at 48:9-11.  Later that night, plaintiff tried to get the assistance of a nurse who passed by his cell but failed because Andrew Thomas had instructed her not to provide any assistance.  Id. at 45:11-14; 46:15-17.  He also sought assistance from the night shift, but "they just laughed at [him]."  Id. at 43:17-18.  Each time plaintiff requested assistance, his cell was

dark, he was naked and his face was covered in blood. Trial Tr. 42:21-25; 43:15-19 (Pl. Test.) (Aug. 3, 2010). Prison administrators finally realized plaintiff was in the cell only because another prisoner wrote to the superintendent to inform him of plaintiff's situation. Trial Tr. 47:14-15 (Pl. Test.) (Aug. 2, 2010).

B.    Gavlik's Testimony

On December 15, 2006, Gavlik was employed as a corrections officer at SCI-Graterford. Trial Tr. 196:14-19 (Gavlik Test.) (Aug. 3, 2010). He was assigned that day to work the 2:00 P.M. to 10:00 P.M. shift on J block. Id. at 197:4-8. At approximately 4:30 P.M., Gavlik, Andrew Thomas and MacGreggor were ordered to prepare plaintiff to be transported to the medical department. Id. at 197:24-25. The three officers proceeded to plaintiff's cell on E wing where they strip searched him and placed him in appropriate restraints. Id. at 198:9-14. The officers then transported him to the barbershop where he was held until the miscellaneous officers[6] assigned to transport him from J block to the medical department arrived. Id. at 198:18-199:6. Plaintiff was at the medical department for approximately forty-five minutes. Id. at 199:11-12.

When the miscellaneous officers brought plaintiff back to J block, they placed him into the barbershop. Id. at 200:4-5. Gavlik, Andrew Thomas and MacGreggor, each of whom were in full uniform, id. at 201:6-25, then transported plaintiff from the barbershop to his new cell on D wing. Id. at 202:1-6. Although Gavlik testified at his deposition that the group went counterclockwise around the bubble, id. at 207:4-6, at trial he was unable to remember in which direction they traveled. Id. at 207:1-2. As the group passed E wing, where plaintiff had formerly

_____

[6]       Miscellaneous officers are officers who are not assigned to a particular detail.

13

been held, the officers informed plaintiff that his new cell was on D wing.  Id. at 202:3-6.  Upon

hearing of his new cell assignment, plaintiff responded "ain't that some shit" and continued

walking without causing any disturbance.  Id. at 202:3-6.

When the officers arrived at cell D-12, they removed the shackles from his legs, placed

him in the cell and removed his handcuffs.  Id. at 202:19-22.  While they were doing so, Gavlik

observed that cell D-12 had "the basic essentials in it," id. at 203:1-3, and that the lights were on.

Id. at 211:1-4.  He admitted, however, that he did not "inspect" the cell, id. at 211:5-6, and was

unaware if the toilet was operational.  Id. at 211:12-15.

At no time did Gavlik, Andrew Thomas or MacGreggor kick or hit plaintiff.  Id. at

203:23-204:7.  They also did not use a stun gun on plaintiff.  Id. at 204:19-21.  Plaintiff was at all

times fully clothed.  Id. at 211:7-9.

C.      MacGreggor's Testimony

On December 15, 2006, MacGreggor was employed as a corrections officer at SCI-

Graterford.  Trial Tr. 218:17-23 (MacGreggor Test.) (Aug. 3, 2010).  That day, he was assigned

to J block.  Id. at 219:1-3.

He was assigned, along with Andrew Thomas and Gavlik, to escort plaintiff from the

barbershop to his new cell on D wing.  Id. at 219:18-21.  While plaintiff was in the medical

department, MacGreggor inspected cell D-12 to make sure it was fit for habitation.  Id. at 223:20-

23.  He found that the cell had a pillow and a mattress and that the toilet was operational.  Id. at

223:20-25.  The three officers then met plaintiff at the barbershop and escorted him clockwise

around the bubble.  Id. at 220:13-17.  During the transport, plaintiff was not agitated or upset.  Id.

at 221:4-8.  The officers placed him in cell D-12 without incident.  Id. at 224:12-14.  They did

not use force on him and they did not remove his clothing.  Id. at 224:6-14.  MacGreggor did not at any time possess a stun gun during the escort.  Id. at 220:23-25.

D.    Andrew Thomas's Testimony

On December 15, 2006, Andrew Thomas was employed as a sergeant at SCI-Graterford. Trial Tr. 17:8-14 (Andrew Thomas's Test.) (Aug. 4, 2010).  That day, he was assigned to J block. Id. at 17:15-16.  His duties included issuing assignments to corrections officers, "run[ing] the shift" and "feed[ing] the meals."  Id. at 18:5-7.

Andrew Thomas was informed that plaintiff's cellmate, who had been absent due to a court appearance, would be returning that afternoon.  Id. at 18:12-17.  When wing officers informed plaintiff of his cellmate's impending return, plaintiff stated that he would not take his cellmate back and proceeded to throw his cellmate's belongings out of his cell.  Id. at 18:22-24. Andrew Thomas went to plaintiff's cell and confirmed that plaintiff was throwing his cellmate's belongings out of the cell.  Id. at 19:14-17.  After informing his superiors of the situation, he was ordered to move plaintiff from E wing to D wing, which contained cells designed for single occupancy.  Id. at 20:2-5.

While Andrew Thomas was arranging to have plaintiff moved, a nurse told plaintiff that he needed to visit the medical department.  Id. at 20:7-10.  Plaintiff was handcuffed and shackled without incident and escorted to the medical department by a team of miscellaneous officers.  Id. at 20:7-13.  When plaintiff returned from the medical department he was placed in the barbershop.  Id. at 20:21-22.  Andrew Thomas, Gavlik and MacGreggor then escorted him to cell D-12 without incident.  Id. at 20:19-24.  According to Andrew Thomas, plaintiff's property was moved from his cell on E wing to cell D-12.  Id. at 7-11.  Andrew Thomas did not witness

anyone use physical force or a stun gun against plaintiff at any time during his transport.  Id. at

21:13-24.  Andrew Thomas also testified that plaintiff was fully clothed when he was placed into

cell D-12 and that he was not strip searched.  Id. at 24:1-4.  However, at his deposition Andrew

Thomas testified that, according to prison procedure, plaintiff was strip searched before he was

placed in the cell.  Id. at 24:14-21.  Andrew Thomas clarified that prison procedure forbids strip

searching a prisoner inside his cell when returning that prisoner to his cell.  Id. at 28:7-15.

Instead, the prisoner would be strip searched in the strip room in order to allow the officers to

collect in a safe manner any contraband recovered.  Id. at 28:5-15.

Although Andrew Thomas ordinarily makes two rounds per shift, id. at 25:19-20, and

therefore walks past every cell on the unit to which he is assigned, id. at 25:19-20, he does not

have a distinct recollection of visiting plaintiff's cell between December 15, 2006 and December

23, 2006.  Id. at 26:14-17; 27:9-12.

E.      Lozar's Testimony

On December 15, 2006, Lozar was a miscellaneous lieutenant at SCI-Graterford.  Trial

Tr. 156:1-12 (Lozar) (Aug. 3, 2010).  A miscellaneous lieutenant fills in for regular lieutenants

who are off duty.  Id. at 157:1-2.  On December 15, 2006, Lozar was the lieutenant in charge of J

block.  Id. at 157:8-9.  He worked the 2:00 P.M. to 10:00 P.M. shift.  Id. at 157:15-17.

Lozar's office was in the bubble.  Id. at 160:13-14.  He was informed that plaintiff was

"becoming a little disruptive" and throwing his cellmate's possessions out of his cell.  Id. at

161:13-19.  When Lozar looked from the bubble up the west corridor, on which plaintiff's cell

was located, he observed "articles, property, or clothing in the inmate walkway."  Id. at 161:13-

21.  Lozar informed the shift commander of the situation and received permission to move

plaintiff to another cell.  Id. at 163:8-12.  Lozar testified that prison practice dictates that when a prisoner is being disruptive, that prisoner, not his cellmate, is moved to a different cell.  Id. at 165:11-20.  Prison officials decided to move plaintiff to D wing, where the cells are designed to hold one person and have plexiglass on the doors.  Id. at 169:17-170:2.  Lozar could not remember precisely to which cell plaintiff was moved.  Id. at 182:19-23

Prison procedure dictates that, prior to moving an inmate from one cell to another, an officer inspect the cell to ensure that everything is working properly.  Id. at 170:9-11.  That officer also fills out a "cell check sheet," which requires the officer "to make sure the bar works, the toilet flushes, that there's a mattress [and] pillow . . . ," id. at 170:15-17, and that the electricity works.  Id. at 170:18-21.  Although Lozar did not remember personally checking cell D-12 prior to moving plaintiff to that cell, id. at 182:7-16, he believed that a cell inspection had been done by one of the other officers.  Id. at 184:10-12.

The plan to move plaintiff was delayed when a nurse requested that plaintiff be brought to the medical department on account of his high blood pressure.  Id. at 165:21-25.  Officers prepared plaintiff for the trip by placing him in restraints and escorting him to the barbershop.  Id. at 166:6-8; 166:25-167:2.  Plaintiff was cooperative.  Id. at 166:3-4.  Miscellaneous officers then escorted plaintiff to the medical department and back.  Id. at 167:6-7.  When plaintiff returned to J block, the miscellaneous officers placed him in the barbershop.  Id. at 168:10-12.  Andrew Thomas, Gavlik, MacGreggor and another officer whom Lozar could not identify at trial escorted plaintiff clockwise around the bubble.  Id. at 171:20-172:1.  Lozar followed the group most of the way to plaintiff's cell.  Id. at 172:12-13.  The officers placed plaintiff in his cell without incident and the five men walked out of D wing.  Id. at 172:15-20.  Lozar did not see any

officer strike or kick plaintiff on December 15, 2006.  Id. at 181:4-11.  Nor did Lozar see anyone

enter plaintiff's cell for the rest of his shift.  Id. at 175:9-11.

According to Lozar, on December 15, 2006, there was only one stun gun on J block.  Id.

at 175:15-18.  It was stored in a locked cabinet inside the bubble.  Id. at 176:11-14.  Lozar had

one set of keys to the cabinet.  Id. at 176:23.  The only other set of keys was sealed in another

cabinet, which officers were permitted to access only in the event of an emergency.  Id. at

176:25-177:3.  The seal around the cabinet is made of plastic and has numbers printed on its

face.  Id. at 6-7.  Whoever breaks the seal must explain to the shift commander why the seal was

broken.  Id. at 177:12-14.  If any equipment is removed from the cabinet, such removal must be

documented in a designated logbook.  Id. at 177:14-17.  Finally, the security department would

make sure all the items in the cabinet were accounted for and then reseal the cabinet.  Id. at

177:17-19.  The stun guns located in other prison buildings were similarly secured.  Id. at

189:23-190:2.  The stun gun stored on J block was not removed from the cabinet on December

16, 2006.  Id. at 181:2-3.

F.      Banta's Testimony

On December 15, 2006, William Banta was employed by SCI-Graterford as the

corrections unit manager for J block.  Trial Tr. 132:3-18 (Banta Test.) (Aug. 3, 2010).  His duty

as unit manager was "to make sure that the unit was operating as described by department

policy."  Id. at 134:25-135:1.  This included ensuring that inmates received items and

services–such as food service, medical service, counseling service and chaplain service–to which

they were entitled.  Id. at 135:1-10.

On a daily basis, there are many non-inmates in J block.  Id. at 133:22-23.  The

18

corrections officers assigned to the unit are present, id. at 133:15-16, as are a corrections counselor and a unit manager. Id. at 133:16-17. Additionally, a chaplain tours the unit on a daily basis, id. at 133:17-18, and medical staff tour the unit three times daily. Id. at 133:18-20. Superintendents, deputy superintendents, the major of the guards, captains and other staff also tour the unit on regular but less predictable basis. Id. at 133:20-23. Prison officials count the inmates at least seven times per day. Id. at 134:1-2. To do so, officers go to each cell and "observe the inmate, see that he's moving, and things are okay." Id. at 134:7-8.

Banta was aware that plaintiff had filed a grievance regarding his living conditions. Id. at 137:21-23. Specifically, plaintiff had complained that corrections officers beat him while he was shackled and dragged him to his cell. Id. at 150:25-151:3. He further complained that he did not have anything in his cell, that he was naked and that he had not been received the medical assistance that he required. Id. at 141:1-4; 151:4-5. John Murray, a deputy superintendent at SCI-Graterford, emailed Banta on December 19, 2006 to look into plaintiff's complaints. Id. at 141:1-4; 150:11-12. That afternoon, Banta proceeded to plaintiff's cell, which had a "partially solid" door with a plexiglass window that was large enough to afford a complete view of the inside of the cell. Id. at 146:23-25; 154:13-15. Upon inspection of plaintiff's cell through the window, Banta found that plaintiff had clothing, sheets, towels and personal items in his cell, as well as excess linens. Id. at 141:9-14. Banta testified that "[plaintiff] had everything he was supposed to have" as well as "stuff that he shouldn't have." Id. at 141:11-14. Banta also spoke to plaintiff, who stated that "all he wants is to move over to L Block, and if he can do that, he

doesn't need to see PRC.[7]" Id. at 155:2-4. Banta found plaintiff's complaints to be unfounded, id. at 142:8-9, and informed Murray of his findings via an email dated December 20, 2006. Id. at 150:8-10.

III.    January 10, 2007

    A.    Plaintiff's Testimony

On January 10, 2007, plaintiff was housed in cell D-205 on L block. Trial Tr. 52:21 (Pl. Test.) (Aug. 2, 2010). Plaintiff had spent approximately two hours in the law library when Trower, a corrections officer, and Craiter, a nurse's assistant, came to take plaintiff's blood pressure. Id. at 52:21-24. As Trower, Craiter and a "trainee" who plaintiff was unable to identify escorted plaintiff back to his cell, plaintiff stopped to talk to "the lieutenant." Id. at 52:24-25. Plaintiff was handcuffed behind his back. Id. at 53:3-5.

Plaintiff's cell was on the second floor of D wing. Id. at 55:12-15; 72:6-7. As the group was walking up the stairs, Craiter "said something foul" to plaintiff. Id. at 72:19-21. Plaintiff could not remember precisely what she said. Id. at 72:22-23. Nor could plaintiff remember precisely what he said in response, although he did remember responding in some fashion. Id. at 73:3-6. Craiter then kicked plaintiff's foot and "tapped" him in the back of the head. Id. at 53:12-14; 73:25-74:1. Plaintiff, taking Craiter's actions and words as both threatening and disrespectful, id. at 73:16-17, looked incredulously at her. Id. at 53:15-17.

In response to the exchange between plaintiff and Craiter, Trower grabbed plaintiff by the arm and slammed plaintiff to the ground. Id. at 53:22-24. While plaintiff was on the ground,

---

[7]    The acronym "PRC" refers to the "program review committee," which is empaneled to review prisoner complaints. Trial Tr. 42:13-16 (Pl. Test.) (Aug. 2, 2010).

Trower punched plaintiff in his body, arms and shoulders and Craiter spit on him. Id. at 53:24-54:2. They then shut plaintiff's cell door. Id. at 54:6-7. Corey Smith, an inmate who was housed in a cell across from plaintiff's, observed the assault. Id. at 55:23-56:6.

As a result of the assault, plaintiff suffered "pain in [his] body." Id. at 56:13. He asked Trower for medical treatment but Trower refused to send plaintiff to the medical department. Id. at 57:8-10. In the meantime, other inmates were "banging on their doors . . . trying to tell the sarge what happened . . . ." Id. at 56:18-20. Plaintiff was denied "food, water, yard [and] exercise" for seven days following the incident. Id. at 57:14; 58:14-20.

Plaintiff denied assaulting Craiter or throwing anything at her. Id. at 57:22-25.

B.     Smith's Testimony

Corey Smith was incarcerated at SCI-Graterford on January 10, 2007. Trial Tr. 5:2-5 (Smith Test.) (Aug. 4, 2010). He was housed on L block in cell D-212, which was almost directly across the corridor from plaintiff's cell. Id. at 3:7-8; 4:6-9. From his cell, Smith was able to see the area outside of plaintiff's cell. Id. at 4:10-12.

On the evening of January 10, 2007, Smith observed an incident outside of plaintiff's cell involving Trower, two nurses aides–whom he identified as "Heather and Edith"–and plaintiff. Id. at 5:4-5; 5:22-23; 6:1-2. When the group arrived at plaintiff's cell, the cell door was open. Id. at 10:18-20. Smith observed Craiter kick plaintiff in the shin. Id. at 7:14-15; 7:18-22. Then, Trower grabbed plaintiff around his midsection, threw him to the ground and punched him more than twice. Id. at 8:7-11; 9:5-6. While plaintiff was on the ground, Craiter kicked him repeatedly and then spit on him. Id. at 9:10-11. They then dragged plaintiff into his cell and shut the door. Id. at 10:1-2. A minute or two later, Trower uncuffed plaintiff through the wicket. Id.

at 11:6-8.

After the incident, Smith did not see plaintiff receive food in his cell. Id. at 12:7-8. When prison officials would bring food to the prisoners on L block, they would not stop at plaintiff's cell. Id. at 12:9-10. Smith did not see plaintiff leave his cell after the incident. Id. at 12:21-23.

C.    Trower's Testimony

On January 10, 2007, Trower was employed as a corrections officer at SCI-Graterford. Trial Tr. 102:1-19 (Trower Test.) (Aug. 3, 2010). That day, Trower was assigned to L block to "do the inmate count, give them meals, escort the nurse, and pass out mail." Id. at 103:9-14. Although he did work alone for most of the day, he also escorted Craiter around L block for what he believed to be a "medication run." Id. at 103:21-22. He did not remember anyone else accompanying Craiter on the medication run. Id. at 113:18-20. Part of his job as an escort was to open the wicket on each cell door and then secure it after Craiter was finished with her responsibilities at the cell. Id. at 105:6-8. The wicket is an opening in the cell door that is approximately six inches tall and approximately ten inches in width. Id. at 114:18-22. It is "slightly above belt level," id. at 114:8-9, and remains in a closed and locked position when not in use. Id. at 105:17-19. Trower testified that the cell doors, which were made of metal and electronically controlled, would never be opened while a member of the medical department was performing the duties that Craiter was performing that day. Id. at 106:2-4.

When they arrived at plaintiff's cell, Trower unlocked and opened the wicket. Id. at 106:16-17. Craiter, who was standing directly to Trower's right, announced that "she was doing medication." Id. at 106:22. Trower then set a tube of toothpaste down on the wicket and told

plaintiff that he could have it.  Id. at 107:1; 107:16.  He had the tube of toothpaste in his pocket

from an earlier assignment requiring him to distribute toiletries.  Id. at 107:6-11.  Upon seeing

the toothpaste, plaintiff stated "what the fuck do I want with that?"  Id. at 107:19.  Trower

responded "[i]t's an extra.  You can take it."  Id. at 107:23.  Plaintiff grabbed the tube of

toothpaste and threw it through the wicket at Craiter.  Id. at 107:25-108:1.  Trower testified that it

hit Craiter on her chest.  Id. at 108:4.  He testified at his deposition, however, that it hit her on the

"upper chest or the neck."  Id. at 115:8-9.  Craiter stated "something along the lines of [t]hat's

assault and that's a medication refusal."  Id. at 108:6-7.  Trower then closed the wicket and

proceeded to the next cell.  Id. at 108:9.  After Craiter finished with her responsibilities, she and

Trower went into the bubble and "informed the sergeant" of plaintiff's misconduct.  Id. at

108:11-12.  The sergeant told Trower to write up an incident report.  Id. at 116:2-14.  Trower

testified at his deposition that he wrote the incident report immediately upon being ordered to do

so.  Id. at 116:11-12.  At trial, however, Trower could not remember if he ever actually wrote the

misconduct report.  Id. at 108:13-15; 108:22-23.  Trower also stated at his deposition that Craiter

testified at a hearing related to plaintiff's misconduct.  Id. at 118:12-17.  According to Trower,

Craiter "described the incident."  Id. at 118:17-21.

 Trower testified that neither he nor Craiter made any manner of physical contact with

plaintiff on January 10, 2007.  Id. at 109:6-7; 109:10-11.  He further testified that plaintiff's cell

door was never opened while he and Craiter were in the vicinity.  Id. at 109:4-5.

 D. Craiter's Testimony

 On January 10, 2007, Craiter was employed as a nurse's assistant at SCI-Graterford.

Id. at 120:2-9.  Her duties, which changed on a daily basis, included inmate intake, blood

pressure checks, assisting on "the insulin line," processing sick call slips and other miscellaneous tasks. Id. at 120:12-16.

On January 10, 2007, Craiter was assigned, along with nurse assistant trainee Edith Martin, to take the blood pressure of inmates housed on L block. Id. at 121:6. Craiter and Martin were escorted by Trower. Id. at 121:6-9. When the trio arrived at plaintiff's cell, Craiter informed plaintiff that Martin would take his blood pressure. Id. at 121:12-13. Craiter testified that plaintiff became verbally abusive and picked up a tube of toothpaste and threw it at Craiter, hitting her in the stomach. Id. at 121:11-17. Craiter was surprised by plaintiff's actions because she had always had a "good rapport" with him. Id. at 121:15. Craiter wrote a misconduct report about the incident, id. at 121:17-19, but never attended a misconduct hearing. Id. at 14-16.

Craiter denied ever hitting or kicking plaintiff. Id. at 122:21-25. She also denied seeing Trower make physical contact with plaintiff. Id. at 123:4-8. Indeed, she testified that plaintiff was in his cell at all times during their interaction on January 10, 2007. Id. at 122:25-123:1.

FINDINGS OF FACT

I.    November 28, 2006

At approximately 6:00 A.M. on November 28, 2006, Earl Thomas and Marshall escorted plaintiff and Whitehead to the prison's internal security department, where the officers placed Bailey on a wooden bench. Whitehead was placed on a similar wooden bench located around the corner from the bench on which Bailey was seated. The benches were approximately six feet apart and there was no direct line of sight between the two. Both inmates were handcuffed behind their backs. Washington was in the security department to provide a urine sample. Plaintiff has not proven that Washington was in the hallway during the time period in which

24

plaintiff alleges that he was assaulted. I accordingly disregard Washington's account of the incident.

Plaintiff was seated in a slouched position on the wooden bench. His legs were extended across the hallway and there was approximately twelve inches of space between his feet and the opposite wall. Achey stepped from his office into the hallway and ordered plaintiff to produce an investigative urine within two hours. Plaintiff responded "fuck you. I ain't giving you no fucking urine." Without responding, Achey returned to his office to print out the urine results that he had received that morning. He then proceeded out of his office and down the hallway toward the room where the printer was located. As he passed plaintiff's outstretched legs, he stated "if you don't move your legs, I'm going to break them." Upon retrieving the urine results from the printer, Achey proceeded back toward his office. As Achey passed plaintiff's still-outstretched legs for the second time, plaintiff kicked him in the leg and stood up. McCusker, who had witnessed the initial exchange between plaintiff and Achey, was standing nearby when plaintiff kicked Achey. McCusker grabbed plaintiff by his lapels and forced him down onto the bench. He asked plaintiff "are you done?" When plaintiff responded in the affirmative, McCusker released his grip on plaintiff's shirtfront. As soon as he was released, plaintiff immediately lunged toward Achey, prompting McCusker and Achey each to grab one of plaintiff's arms and place him back on the bench. As they did so, plaintiff hit the end of the bench and landed in a seated position on the floor. They then lifted plaintiff onto the bench and notified their supervisor of what had occurred.

Plaintiff was taken to the medical department where he was examined by Drumheller and Freedman. He complained that he had been assaulted by two corrections officers and that his jaw

and left leg were both in pain.  Plaintiff's blood pressure and heart rate were both in the normal

range.  He was able to walk without any difficulty and had no visible trauma on his leg.[8]

Although he did have "minimal swelling" near his jaw, he had no loose teeth and was able to

move his jaw freely.

I find that plaintiff has not proven by a preponderance of the evidence that either officer

kicked or punched him at any point during the incident.  Each of the four officers who were in

the security department at the time of the incident testified credibly and consistently that neither

McCusker nor Achey kicked or punched plaintiff.

I find plaintiff's testimony to the contrary to be non-credible.  Although plaintiff testified

that for a period of five minutes he was punched repeatedly in his shoulders, body and the back

of his head, there was no evidence that plaintiff exhibited bruising or swelling in any of those

areas.  Indeed, there is no evidence that he even complained of discomfort in those areas.  The

only credible evidence supporting plaintiff's assertion that he suffered any injury at all is the

testimony of Drumheller and Freeman that plaintiff's jaw was minimally swollen.  The minimal

swelling in his jaw, however, is inconsistent with the severe beating plaintiff alleges he received

at the hands of Achey and McCusker.  I find therefore that to the extent that plaintiff's jaw was

swollen, plaintiff has not proven that the swelling was attributable to an assault.

II.     December 15, 2006

On the morning of December 15, 2006, plaintiff was housed in a cell on E wing of J

---

[8]      Pursuant to questioning by plaintiff's attorney at trial, Drumheller pointed out that
swelling and bruising might not appear until "some time the next day."  Trial Tr. 79:16-24
(Drumheller Test.) (Aug. 3, 2010).  Plaintiff has not presented any evidence, however, that would
allow me to conclude that such swelling and bruising appeared the next day.

block. Upon being informed that his cellmate was returning from a court appearance, plaintiff began throwing his cellmate's belongings into the hallway. This behavior prompted prison administrators to authorize plaintiff's transfer to D wing.

In the meantime, a nurse asked that plaintiff be brought to the medical department to have his blood pressure checked. Andrew Thomas, MacGreggor and Gavlik prepared plaintiff to be transported to the medical department and then escorted him to the barbershop, where he was held until miscellaneous officers arrived to transport him to the medical department. When plaintiff returned to J block later that afternoon, he was again secured in the barbershop. The same trio of officers then escorted him to cell D-12. When they arrived at D-12, they placed him inside and removed his restraints without incident. Plaintiff was fully clothed when he was placed inside cell D-12.

I find no defendant kicked, punched, dragged or used a stun gun upon plaintiff. I also find that the cell in which plaintiff was housed between December 15, 2006 and December 20, 2006 contained a mattress, a pillow and at least one blanket, one sheet and one towel. Both the lights and the toilet were operational. The cell was not strewn with feces, urine or sour milk. Finally, I find that plaintiff was not deprived of food and water from December 15, 2006 through December 20, 2006. Plaintiff's testimony to the contrary is not credible.

III.    January 10, 2007

On January 10, 2007, plaintiff was in his cell when Craiter, Trower and Martin arrived to take his blood pressure. During the medical visit, the plaintiff's cell door remained closed and locked and plaintiff did not leave his cell. Neither Craiter nor Trower made physical contact with him. Testimony by plaintiff and Smith to the contrary is not credible. Additionally, I find that

27

there is no credible evidence that plaintiff was denied food, water and exercise from January 10, 2007 to January 17, 2007.

ANALYSIS

I.      Excessive Force Claims

The Eighth Amendment, which is applicable to the states via the Fourteenth Amendment, <u>Robinson v. California</u>, 370 U.S. 660 (1962), prohibits the use of excessive force by prison officials upon convicted prisoners. <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000). The "central question" in an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Id.</u>, <u>citing</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992). In answering this question, courts look to the following factors:

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

<u>Id.</u>, <u>citing</u> <u>Whitley v. Ablers</u>, 475 U.S. 312, 321 (1986). In addition, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983. . . . . However, an officer is only liable if there is a realistic and reasonable opportunity to intervene." <u>Smith v. Mensinger</u>, 299 F.3d 641, 650-51 (3d Cir. 2002) (internal citation omitted). I will discuss each of plaintiff's excessive force claims in turn.

A.      November 28, 2006

Plaintiff claims that on November 28, 2006 Achey and McCusker assaulted him. He claims that he did nothing to justify the officer's attack upon him.

I find that plaintiff has not proven that he was assaulted on November 28, 2006. I will accordingly enter judgment in favor of Achey and McCusker and against plaintiff on this claim.

B.      December 15, 2006

Plaintiff claims that on December 15, 2006, Thomas, Gavlik and MacGreggor assaulted him and that Lozar witnessed the assault but did not intervene. I find that plaintiff has not proven that he was assaulted on December 15, 2006. As a result, I also find that plaintiff has not proven that Lozar witnessed an assault without intervening. I will accordingly enter judgment in favor of Thomas, Gavlik, MacGreggor and Lozar and against plaintiff on this claim.

C.      January 10, 2007

Plaintiff claims that on January 10, 2007, Craiter and Trower assaulted him. I find that plaintiff has not proven that he was assaulted on January 10, 2007. I will accordingly enter judgment in favor of Craiter and Trower and against plaintiff on this claim.

II.      Inhumane Conditions of Confinement

In addition to its proscription of the use of excessive force upon inmates, the Eighth Amendment also imposes on prison officials a duty to provide "humane conditions of confinement." Betts v. N. Castle Youth Dev. Ctr., 621 F.3d 249, 256 (3d Cir. 2010). Specifically, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Id., citing Farmer v. Brennan, 511 U.S. 825, 832 (1992). "For an alleged deprivation to rise to the level of an Eighth Amendment violation, it must result in the denial of the minimal civilized

measure of life's necessities." Id. (internal quotation marks omitted), citing Farmer, 511 U.S. at 835. I will discuss each of plaintiff's conditions of confinement claims in turn.

A.    December 15, 2006 through December 20, 2006

Plaintiff claims that Thomas, MacGreggor, Gavlik and Lozar were deliberately indifferent to the fact that he was confined from December 15, 2006 through December 20, 2006 in a filthy cell without a mattress, pillow, sheets, blankets, towels, water, food or medical attention. I find that plaintiff has not proven his allegations. I will accordingly enter judgment in favor of Thomas, MacGreggor, Gavlik and Lozar and against plaintiff on this claim.

B.    January 10, 2007 through January 17, 2007

Plaintiff claims that Trower and Craiter were deliberately indifferent to the fact that he was denied food, water and exercise from January 10, 2007 through January 17, 2007. I find that plaintiff has not proven his allegations. I will accordingly enter judgment in favor of Trower and Craiter and against plaintiff on this claim.

CONCLUSION

For the foregoing reasons, I will enter judgment in favor and defendants and against plaintiff on all counts.

An appropriate Order follows.